UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

KATHY J. DUNKER,                                              **REPORT AND**
                                Plaintiff,                        **RECOMMENDATION**

v.
                                                                11-CV-0321(A)(M)

MICHAEL J. ASTRUE, COMMISSIONER
SOCIAL SECURITY ADMINISTRATION,

                                Defendant.
_____

## INTRODUCTION

        This case was referred to me by Hon. Richard J. Arcara to hear and report in accordance with 28 U.S.C. §636(b)(1)(B) [5]. Before me is defendant's unopposed motion for judgment on the pleadings [7].[1] On July 6, 2011, I issued a scheduling order that required plaintiff to file a motion for dispositive relief by October 4, 2011 and to file her opposition to defendant's cross-motion by February 1, 2012 [6]. Plaintiff has neither filed a dispositive motion nor filed any opposition to defendant's motion, and has not sought an extension of these deadlines.

        Nevertheless, I cannot grant the motion by default. "Although . . . failure to respond 'may allow the district court to accept the movant's factual assertions as true, the moving party must still establish that the undisputed facts entitle him to a judgment as a matter of law.'" McDowell v. Commissioner, 2010 WL 5026745, *1 (E.D.N.Y. 2010) *citing* Vt. Teddy Bear Co. v. 1-800 Beargram Co., 373 F.3d 241, 246 (2d Cir. 2004); *see also* Martell v. Astrue,

---

[1]     Bracketed references are to the CM/ECF docket entries.

2010 WL 4159383, *2 n.4 (S.D.N.Y. 2010).² Accordingly, I will analyze the merits of defendant's Fed. R. Civ. P. ("Rule") 12(c) motion.

### PROCEDURAL BACKGROUND

On April 12, 2007, plaintiff filed an application for Supplemental Security Income ("SSI") and Disability Insurance Benefits ("DIB") alleging that she had been unable to work since April 16, 2001 (T145).³ She claimed to suffer from bipolar disorder, panic attacks, and lower back arthritis (id.). Her initial claim was denied on November 7, 2007 (T68-71). A hearing was conducted on September 18, 2009 before administrative law judge ("ALJ") Timothy M. McGuan (T12, 21-65). Plaintiff was represented at the hearing by Felice A. Brodsky, Esq. (T23). A vocational expert, Dr. Timothy P. Janikowski, also appeared and testified (T21, 58-63). At the hearing, plaintiff's attorney amended the alleged disability onset date to August 31, 2006 (T25). On September 30, 2009, ALJ McGuan issued a decision finding that plaintiff was not disabled within the meaning of the Social Security Act (T12-19). This became the final decision of the Social Security Commissioner on March 8, 2011, when the Appeals Council denied plaintiff's request for review (T1-3). This action followed [1].

---

  ²   *Compare with* Seeley v. Commissioner, 2012 WL 5334746, *4 (N.D.N.Y. 2012) (initially acknowledging that a court is empowered to dismiss an action where "the plaintiff fails to prosecute or to comply with [the Federal rules of Civil Procedure] or a court order . . ." and that authority exists to support the *sua sponte* dismissal of a Social Security appeal where a *pro se* plaintiff fails to prosecute, but nevertheless proceeding to analyze the merits of the Commissioner's unopposed motion for judgment on the pleadings).

  ³   References to "T" are to the certified transcript of the administrative record.

## THE ADMINISTRATIVE RECORD

Plaintiff sought SSI and DIB benefits due to "[b]ipolar disorder, panic attacks and arthritis in [her] lower back" (T145).

### A.     Medical Evidence during the Relevant Period of Review[4]

Plaintiff has an extensive medical history of treatment for various physical and mental ailments as well as a history of polysubstance abuse. The record begins with plaintiff's admission to Niagara Falls Memorial Medical Center ("NFMMC") on October 19, 2006 (T262). At the time of her admission, she stated that "[she] wanted to kill [herself]….[and] take an overdose" (id.). The medical report indicated that plaintiff used marijuana, crack cocaine, and powder cocaine on a daily basis, and that she used heroin once a month (id.). Kalaselvi Rajendran, M.D., filed a report stating that plaintiff "seems to be underestimating her drug dependence" (id.). Dr. Rajendran also performed a mental status examination and noted that she "strongly believe[s] some of the [plaintiff's] problems are very much exaggerated due to her drug problem" (T263). Plaintiff requested to be released, and was discharged on October 30, 2006 with referrals to mental health counseling and substance abuse interventional counseling (T264-65).

#### 1.      Plaintiff's Alleged Physical Impairments

On October 9, 2007, Manjushree Dey, M.D. treated the plaintiff for chronic peptic ulcer disease and inflammatory bowel disease (T319-22). In an October 23, 2007 report,

---

[4]      According to ALJ McGuan, the relevant period of review is November 12, 2005 (for DIB benefits) and April 12, 2007 (for SSI benefits) through September 30, 2009 (T12).

Dr. Dey wrote that plaintiff had no limitations in any physical activity, no behavior suggestive of a significant psychiatric disorder, and "no alcohol or drug history" (T319-23).

From November 19, 2007 to March 6, 2009, plaintiff received medication and refills from her primary care physician, David Stahl, M.D. On one occasion, plaintiff contacted Dr. Stahl's office requesting pain medication, but was not given any because she had missed her previous appointment and had admitted that she "has been buying Hydro's [*sic*] off the street" (T405).

On August 4, August 18, and September 8, 2008, and May 5 and June 1, 2009, plaintiff was given epidural injections of 1% Lidocaine at the L5-S1 interspace of her spine (T439-452). January 20, 2009 x-rays revealed that her pelvis and bilateral hips were "unremarkable", there was no evidence of an acute fracture or dislocation of the lumbar spine, there was minimal degenerative disc disease at the L3-4 and L5-S1 levels, and there were minimal facet joint degenerative changes at the L4-5 and L5-S1 levels (T412-14). A single bone densitometry report dated November 11, 2008, indicated that plaintiff was considered "osteoporotic" according to World Health Organization guidelines (T415), but no other indication of osteoporosis appears in the record.

   a.  **Consultative Physical Examinations**

On August 21, 2007, Kathleen Kelley, M.D., performed a physical examination of plaintiff (T299). Dr. Kelley indicated that plaintiff complained of "nonspecific low back discomfort", but had "no obvious limitation" at the exam (id.). A lumbosacral spine x-ray showed small anterior osteophytes (bone spurs) in the lumbar spine (T304). Although plaintiff denied the use of alcohol or drugs, she admitted that she used "not very much" marijuana from

the age of 16 until 1992, and "not much" crack cocaine from the age of 20 through 1992 (T300). Dr. Kelley concluded that plaintiff would have marked limitations in environments with heights or heavy machinery because of her "history of ataxia" and balance problems (T303).

On November 6, 2007, state agency review physician V. Yu, M.D., reviewed the record and determined that plaintiff retained the ability to lift twenty pounds "occasionally" and ten pounds "frequently", could walk six hours in an eight-hour period, and had an environmental hazard restriction (T344).

### 2.     Plaintiff's Alleged Mental Impairments

From January 25, 2008 to June 3, 2008, plaintiff was treated at the Niagara County Department of Mental Health ("NCDMH") (T364-75). Four mental status examinations conducted by Cynthia McPhaden, M.S., L.M.H.C., C.R.C. during this period show unremarkable psychomotor behavior, good hygiene, good eye contact, and an appropriate appearance (T370, 372, 374-75). Plaintiff's verbal production was good-to-fair, and she was interactive (id.). These status examinations show that plaintiff was focused at times (T370, 372, 375) and "defocused" on at least one instance (T374). Her thought content was relevant and coherent, and she was oriented in terms of person, place, and time (T370, 372, 374-75). Her mood/affect was at times depressed, anxious, and flat/blunted (T372, 374-75). On one occasion, her mood was euthymic and appropriate (T370). Plaintiff admitted to substance abuse on one occasion (T374). Plaintiff's

Global Assessment of Functioning ("GAF")[5] was assessed at each of these four mental status examinations as being 60, 57, 57, and 58 (T370, 372, 374-75).

Plaintiff was treated by other medical professionals during her time at NCDMH. On May 2, 2008, Wendy Weinstein, M.D., reported that despite plaintiff's history of bipolar disorder, "it is difficult to really tease out true bipolar disorder" because there is a "high comorbidity with bipolar disorder and polysubstance abuse" (T378). Dr. Weinstein also reported that plaintiff feels the medicine she is on now is "really helping her quite a bit", but concluded that it is complicated by plaintiff's use of marijuana "since the age of thirteen" and continued use of crack cocaine "about once a week" (id.). At the time of this meeting, plaintiff stated she had "not been using crack for the last two weeks and is going to NA" (id.).

According to Dr. Weinstein's mental status examination, plaintiff was pleasant, appeared slightly older than her stated age, and was cooperative without any psychomotor agitation (T379). Her speech was clear and coherent, her mood was okay, and her affect was appropriate (id.). She denied any auditory or visual hallucinations or delusions, her thought process was goal-directed, and her insight and judgment were fair (id.). Dr. Weinstein assessed her GAF at 50.[6] Plaintiff asked Dr. Weinstein not to inform Dr. Stahl about her substance abuse history, but Dr. Weinstein refused (id.). On June 3, 2008, plaintiff was discharged from NCDMH due to a lack of contact (T368). On June 4, 2008, Dr. Weinstein's final mental status

---

[5] GAF rates overall psychological functioning on a scale of 1-100 that takes into account psychological, social, and occupational functioning. "A GAF between 51 and 60 indicates '[m]oderate symptoms OR moderate difficulty in social, occupational, or school functioning.'" Kohler v. Astrue, 546 F.3d 260, 262 n. 1 (2d Cir. 2008) (emphasis in original) (quoting American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders, ("DSM-IV"), at 32 (4th ed. rev. 2000)).

[6] "[A] GAF score of 41-50 denotes serious symptoms or any serious impairment in social, occupational, or school functioning." Hill v. Astrue, 2012 WL 2178925, * 3 n. 3 (N.D.N.Y. 2012).

examination of plaintiff indicated that she was pleasant and cooperative, her affect was appropriate, and there was no lethality or psychosis (T376).

From September 29, 2008 to July 2, 2009, Naureen R. Jaffri, D.O., treated plaintiff (T455-57, 464-75). At the initial September 29, 2008 mental status examination, plaintiff had appropriate hygiene and grooming, and was cooperative and pleasant (T470). Although plaintiff stated she was "doing really well" with her medication regimen, she was still experiencing occasional crying spells and episodes of agitation (id.). She denied any hallucinations, delusions, or paranoia (id.). Her thought process was goal-directed, and her immediate and recent recall was intact (id.). She was of average to low average intelligence, and her insight and judgment were adequate (id.). Plaintiff's GAF was 60 (T471). Dr. Jaffri noted that plaintiff "continue[s] to smoke cannabis nightly" and has had "sporadic episodes of crack cocaine use", with the last claimed use in May 2008 (T470).

Dr. Jaffri's subsequent mental status examinations indicate that plaintiff was well groomed, cooperative, with fluent speech and language, no psychomotor involvement, logical and coherent thought processes, appropriate thought content, no perceptual disturbances, and adequate insight and judgment (T464-68). Dr. Jaffri noted on each of five separate appointments that plaintiff continued to smoke marijuana despite medical recommendations to stop (id.). At her December 16, 2008 appointment, plaintiff reported to Dr. Jaffri that she had been arrested for shoplifting (T467). In a note dated December 4, 2008, Dr. Jaffri stated that plaintiff denied using any drugs (T472).

On May 1, 2009, plaintiff appeared at the NFMMC emergency room and wanted to speak with a particular doctor (T383). She stated that she was not having suicidal or homicidal thoughts and was taking her medication (id.). An examination showed no abnormalities, but

plaintiff was described as agitated and crying because she was upset about the long wait (T384-85). Plaintiff's speech was slow and her eyes "closed easily" (T385). Plaintiff denied drug use (T385-86), but lab results dated May 6, 2009 were positive for marijuana and cocaine (T476).

On May 6, 2009, Dr. Jaffri completed a mental impairment questionnaire provided by plaintiff's attorney (T458-63). Dr. Jaffri stated that plaintiff's current GAF was 55 and opined that plaintiff's impairments would cause her to be absent from work more than three times a month, her mental abilities and aptitude to perform unskilled work were fair to poor or none, she had a moderate restriction of activities of daily living, an extreme difficulty in maintaining social functioning, frequent deficiencies in maintaining concentration, persistence, or pace, and repeated episodes of decompensation (T462).

On September 2, 2009, Dr. Jaffri responded to a second questionnaire from plaintiff's attorney. Dr. Jaffri agreed that plaintiff had not used illegal drugs in the "past few months", and opined that she would still be unable to work, even if she abstained from any further drug use (T454).

      a.      **Consultative Mental Examinations**

On August 21, 2007, Kevin Duffy, Psy.D., examined plaintiff (T305). Dr. Duffy noted that plaintiff had received inpatient and outpatient psychiatric treatment in the past, and that she currently sees a psychiatrist once a month (id.). Dr. Duffy performed a mental status examination and concluded that plaintiff could follow and understand simple directions and instructions, perform simple tasks independently, maintain attention, concentration, and a regular schedule, learn new tasks, and perform complex tasks independently (T308). However, Dr. Duffy also concluded that plaintiff may have difficulty relating to others and dealing

appropriately with stress (id.). Finally, Dr. Duffy noted that the results of the exam "appear to be consistent with psychiatric problems" and that this may "significantly interfere with the [plaintiff's] ability to function on a daily basis" (id.).

On November 2, 2007, state agency psychologist M. Totin, Ph.D., reviewed the record and determined that plaintiff had a mild limitation in activities of daily living (T336). Dr. Totin also determined that plaintiff had moderate limitations in maintaining social functioning and maintaining concentration, persistence, or pace, and noted one or two episodes of deterioration (id.). Based on these conclusions, Dr. Totin stated that plaintiff's impairments did not meet or equal a "listing level" under the Commissioner's regulations (T338).[7]

B.      Administrative Hearing Conducted on September 18, 2009

   1.      Plaintiff's Testimony

Plaintiff completed ninth grade and reads and writes in English (T25, 144). She testified that she used marijuana and "cocaine…here and there", but had stopped using both substances in 2008 (T44). She also testified that she was arrested in December 2008 for petty larceny after stealing cosmetics (id.). She testified that when she is not using marijuana and cocaine, her psychiatric symptoms become worse (T51). She testified that the epidural shots "really help a lot" in managing her physical back discomfort (T55). Plaintiff testified that she had never purchased any medication off the street (T57). When asked by ALJ McGuan why Dr. Stahl had refused to fill her prescriptions, plaintiff testified that it was because the doctors wanted her to "try to handle the pain . . . without any medication" (T56-57). When asked

---

[7]      The "Listing of Impairments" or "Listings" are contained in the Commissioner's regulations at Appendix 1 to 20 C.F.R. Part 404, Subpart P.

whether she had ever bought any medication, such as Hydrocodone, off the street, plaintiff reiterated that she had never purchased any medication illegally off the street (T57). When ALJ McGuan pointed out that the medical evidence contradicted her testimony and that Dr. Stahl had refused her medication because she had been "buying them illegally off the street", she admitted that she bought five Hydrocodone pills from her girlfriend's daughter (id.).

      **2.**      **Vocational Expert Testimony**

At the hearing, ALJ McGuan asked vocational expert Timothy P. Janikowski to consider a hypothetical individual with the residual functional capacity ("RFC"), age, education, and vocational history analogous to the plaintiff (T60). Dr. Janikowski testified that a hypothetical individual with these limitations would not be able to perform plaintiff's past relevant work (id.), but there were other jobs available in the national and regional economy that this individual could perform (id.). Referencing the Dictionary of Occupational Titles ("DOT"), Dr. Janikowski testified that the hypothetical individual could perform the job of "bench assembler" (T61). This is light, unskilled work that allows the individual to alternate sitting and standing at their own discretion (id.). There are approximately 445,000 bench assembler jobs in the nation and approximately 800 such jobs in the region (id.). Dr. Janikowski also indicated that the individual could perform the job of "office helper" (id.). This is light, unskilled work that allows the individual to alternate between sitting and standing, and only requires occasional interaction with the public (id.). There are approximately 300,000 unskilled office helper jobs in the nation and approximately 1,400 such jobs in the region (id.).

**C.     ALJ McGuan's Decision dated September 30, 2009**

ALJ McGuan made the following findings in connection with plaintiff's application: (1) plaintiff has not engaged in substantial gainful activity since April 16, 2001, the original alleged onset date; (2) plaintiff's severe impairments are: polysubstance dependence, bi-polar disorder, osteoporosis, and lumbar spine dysfunction; (3) plaintiff's impairments, including the substance use disorders, meet Listings §§12.04 and 12.09; (4) if plaintiff stopped the substance use, she would continue to have a severe impairment or combination of impairments; (5) if plaintiff stopped the substance use, the remaining impairments would not meet or medically equal Listing §12.04; (6) if plaintiff stopped the substance use, she would have the residual functional capacity necessary to perform light work with the following limitations: she should be allowed to alternate between sitting and standing or walking every 30 minutes, she can only occasionally interact with the public, and she can only occasionally understand, remember, and carry out complex and detailed tasks; (7) if plaintiff stopped the substance use, there would be a significant number of jobs in the national economy she could perform; and (8) because the plaintiff would not be disabled if she stopped the substance use, the substance use is a contributing factor material to the determination of disability (T15-19). Therefore, he concluded that plaintiff had not been disabled within the meaning of the Social Security Act at any time during the period in issue (T19).

ALJ McGuan found that plaintiff's subjective complaints of disability were not credible based on her continual attempted concealment of her drug abuse and her conviction for a crime of moral turpitude (T17). ALJ McGuan found that the record indicated the bi-polar disorder was "largely brought on" by plaintiff's polysubstance abuse, and that she had a "tendency to exaggerate some of her problems" (id.). Notably, ALJ McGuan found that when the

plaintiff abstained from polysubstance abuse, she "responded so well to treatment that her [GAF] scores were indicative of mild-moderate symptoms and/or limitations" (id.). ALJ McGuan also noted that Dr. Weinstein, a treating psychiatrist, had indicated that "at least some of the [plaintiff's] symptomatology was due to polysubstance abuse" (id.), and that when she was examined by Dr. Duffy on August 21, 2007, plaintiff denied a substance abuse history (id.). On that assumption, Dr. Duffy found the plaintiff was responding well to treatment and only potentially had some difficulty relating adequately with others or dealing appropriately with stress (id.).

ALJ McGuan further found that there was little treatment for osteoporosis in the medical record and that the plaintiff has maintained a "full range of motion" with very conservative treatment of her lumbar spine discomfort (T18). Finally, ALJ McGuan noted that "[n]o treating or examining source has said the [plaintiff] was disabled independent of polysubstance abuse" (id.). Based on these findings and conclusions, ALJ McGuan denied plaintiff's application for benefits.

## DISCUSSION AND ANALYSIS

**A.    Scope of Judicial Review**

The Social Security Act states that, upon review of the Commissioner's decision by the district court, "the findings of the Commissioner . . . as to any fact, if supported by substantial evidence, shall be conclusive . . . ." 42 U.S.C. § 405(g). Substantial evidence is that which a "reasonable mind might accept as adequate to support a conclusion". Consolidated Edison Co. of New York, Inc. v. NLRB, 305 U.S. 197, 229 (1938).

Under this standard, the scope of judicial review of the Commissioner's decision is limited. This court may not try the case *de novo*, nor substitute its findings for those of the Commissioner. See Townley v. Heckler, 748 F.2d 109, 112 (2d Cir. 1984). Rather, the Commissioner's decision is only set aside when it is based on legal error or is not supported by substantial evidence in the record as a whole. See Balsamo v. Chater, 142 F.3d 75, 79 (2d Cir. 1988). If supported by substantial evidence, the Commissioner's finding must be sustained "even where substantial evidence may support the plaintiff's position and despite that the Court's independent analysis of the evidence may differ" from that of the Commissioner. Martin v. Shalala, 1995 WL 222059, *5 (W.D.N.Y. 1995) (Skretny, J.).

Before deciding whether the Commissioner's determination is supported by substantial evidence, the court must first examine "whether the Commissioner applied the correct legal standard" to the plaintiff's disability benefits claim. Tejada v. Apfel, 167 F.3d 770, 773 (2d Cir. 1999). "Failure to apply the correct legal standards is grounds for reversal." Townley, 748 F.2d at 112.

**B.      The Disability Standard**

The Social Security Act provides that a claimant will be deemed to be disabled "if he is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. §1382c(a)(3)(A). The impairments must be "of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ." §1382c(a)(3)(B).

The determination of disability entails a five-step sequential evaluation process:

1. The Commissioner considers whether the claimant is currently engaged in substantial gainful activity.

2. If not, the Commissioner considers whether the claimant has a 'severe impairment' which limits his or her mental or physical ability to do basic work activities.

3. If the claimant has a 'severe impairment,' the Commissioner must ask whether, based solely on medical evidence, claimant has an impairment listed in Appendix 1 of the regulations. If the claimant has one of these enumerated impairments, the Commissioner will automatically consider him disabled, without considering vocational factors such as age, education, and work experience.

4. If the impairment is not 'listed' in the regulations, the Commissioner then asks whether, despite claimant's severe impairment, he or she has [("RFC")] to perform his or her past work.

5. If the claimant is unable to perform his or her past work, the Commissioner then determines whether there is other work which the claimant could perform. The Commissioner bears the burden of proof on this last step, while the claimant has the burden on the first four steps.

Shaw v. Chater, 221 F.3d 126, 132 (2d Cir. 2000); See 20 C.F.R. §§404.1520(d), 426.920(d). The "regulations . . . limit the Commissioner's burden at step five. See 20 C.F.R. [§] 404.1560(c) . . . The commissioner's step-four RFC determination (with the claimant bearing the burden of proof) now controls at both steps four and five…. The Commissioner applies the RFC determination from step four to meet his burden at step five. Using the claimant's RFC, the Commissioner must then show at step five that 'there is other gainful work in the national economy which the claimant could perform.'" Spain v. Astrue, 2009 WL 4110294, *3 (E.D.N.Y. 2009).

Additionally, when a claimant is found disabled under the five-step evaluation and there is medical evidence of substance abuse, the ALJ must determine whether the drug

addiction or alcoholism ("DA&A") is material to a finding of disability. 42 U.S.C. §§423(d)(2)(C); 1382c(a)(3)(J). An individual "shall not be considered . . . disabled . . . if alcoholism or drug addiction would . . . be a contributing factor material to the Commissioner's determination that the individual is disabled." Id. In making that determination, the "key factor" the Commissioner considers is "whether we would still find you disabled if you stopped using drugs or alcohol". 20 C.F.R. §§404.1535(b)(1); 416.935(b)(1). If the Commissioner determines the claimant's remaining limitations would not be disabling in the absence of drug or alcohol use, DA&A will be found to be a contributing factor material to the determination of disability. Id. Where the record reflects evidence of DA&A, the claimant bears the burden of proving that the substance abuse is not a contributing factor material to the disability determination. *See* Cage v. Commissioner, 692 F.3d 118, 123 (2d Cir. 2012).

**C.     The Treating Physician Rule**

Defendant acknowledges that "the ALJ erred in not addressing" Dr. Jaffri's September 2, 2009 report (Defendant's Memorandum of Law [8], p. 20). However, defendant argues that because Dr. Jaffri's opinion is based on plaintiff's subjective symptomatology, this error is "of no import". Id. While "[i]t is the function of the Secretary, not [the reviewing courts], to resolve evidentiary conflicts and to appraise the credibility of witnesses, including the claimant" Carroll v. Secretary of Health and Human Services, 705 F.2d 638, 642 (2d Cir. 1982), this fact "does not exempt administrative decisionmakers from their obligation . . . to explain why a treating physician's opinions are not being credited". Snell v. Apfel, 177 F.3d 128, 134 (2d Cir. 1999). The treating physician's opinion must be given controlling weight if it is "'well-

supported by medically acceptable [evidence] and is not inconsistent with the other substantial evidence in [the] record.'" Id. (*quoting* 20 C.F.R. § 404.1527(c)(2)).

Although the treating physician's opinion need not be given controlling weight where it is "contradicted by other substantial evidence in the record", Veino v. Barnhart, 312 F.3d 578, 588 (2d Cir. 2002), the Commissioner must recite "good reasons" for not crediting the opinion. Snell, 177 F.3d at 133.[8] "The requirement of reason-giving exists, in part, to let claimants understand the disposition of their cases, even – and perhaps especially – when those dispositions are unfavorable". Id. at 134; *see also* Montalvo v. Barnhart, 457 F. Supp. 2d 150, 168 (W.D.N.Y. 2006) (Elfvin, J.).

Here, Dr. Jaffri, plaintiff's treating physician, responded to a September 2, 2009 questionnaire from plaintiff's attorney and stated that plaintiff's mental health problems would prevent her from being able to return to work even if she were to abstain from any further drug use (T454).[9] Not only did ALJ McGuan fail to give "good reasons" in his decision for why he did not credit Dr. Jaffri's assessment, he completely failed to acknowledge Dr. Jaffri's opinion at all. Rather, ALJ McGuan's decision stated that "[n]o treating or examining source has said the claimant was disabled independent of polysubstance abuse" (T18). This statement is clearly incorrect. Dr. Jaffri's report indicates exactly the opposite—that plaintiff would continue to be disabled even if she were to abstain from future drug use. "Failure to provide 'good reasons' for not crediting the opinion of a claimant's treating physician is a ground for remand." Snell, 177

---

[8] "We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion." 20 C.F.R. §404.1527(c)(2).

[9] Dr. Jaffri's report is unsigned and provides no explanation beyond "yes in my professional opinion" (T454). However, defendant does not contest that Dr. Jaffri's response to the questionnaire is properly in the record or that ALJ McGuan failed to address it.

F.3d at 133; *see also* Halloran v. Barnhart, 362 F.3d 28, 33 (2d Cir. 2004) ("We do not hesitate to remand when the Commissioner has not provided 'good reasons' for the weight given to a treating physician's opinion and we will continue remanding when we encounter opinions from ALJ's that do not comprehensively set forth the reasons for the weight assigned to a treating physician's opinion").

Defendant argues that ALJ McGuan's failure to address Dr. Jaffri's September 2, 2009 report "is not reversible error". Defendant's Memorandum of Law [8], p. 20. "[C]ourts have found harmless error where the ALJ failed to afford weight to a treating physician when an analysis of weight by the ALJ would not have affected the outcome". Ryan v. Astrue, 650 F. Supp. 2d 207, 217 (N.D.N.Y. 2009). *See* Zabala v. Astrue, 595 F.3d 402, 409 (2d Cir. 2010) ("Where application of the correct legal principles to the record could lead only to the same conclusion, there is no need to require agency reconsideration"). However, here, if Dr. Jaffri's report (T454) was credited, it would affect the outcome of plaintiff's case. Therefore, I conclude that ALJ McGuan's failure to address Dr. Jaffri's report does not constitute harmless error.

Accordingly, notwithstanding plaintiff's failure to oppose defendant's motion, I recommend the case be remanded for consideration of Dr. Jaffri's September 2, 2009 report and to provide a written explanation for accepting or rejecting it.

## CONCLUSION

For these reasons, I recommend that defendant's motion for judgment on the pleadings be denied [7], and that this case be remanded to the Commissioner for further proceedings consistent with this Report and Recommendation.

Unless otherwise ordered by Judge Arcara, any objections to this Report and Recommendation must be filed with the clerk of this court by January 23, 2014 (applying the time frames set forth in Rules 6(a)(1)(C) and 72(b)(2)). Any requests for extension of this deadline must be made to Judge Arcara. A party who "fails to object timely…waives the right to further judicial review of [this] decision". <u>Thomas v. Arn</u>, 474 U.S. 140, 155 (1985); <u>Wesolek v. Canadair Ltd.</u>, 838 F.2d 55, 58 (2d Cir. 1988).

Moreover, the district judge will ordinarily refuse to consider *de novo* arguments, case law, and/or evidentiary material which could have been, but were not, presented to the magistrate judge in the first instance. <u>Patterson-Leitch Co v. Massachusetts Municipal Wholesale Electric Co.</u>, 840 F.2d 985, 990-91 (1st Cir. 1988).

The parties are reminded that, pursuant to rule 72(b) and (c) of this Court's Local Rules of Civil Procedure, written objections shall "specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for each objection…supported by legal authority", and must include "a written statement either certifying that the objections do not raise new legal/factual arguments, or identifying the new arguments and explaining why they were not raised to the Magistrate Judge". Failure to comply with these provisions may result in the district judge's refusal to consider the objections.

**SO ORDERED.**

DATED: January 6, 2014

       /s/ Jeremiah J. McCarthy
       JEREMIAH J. MCCARTHY
       United States Magistrate Judge